# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **LEAD CASE NO. 18-50788-RBK** |
| **THE HJH CONSULTING GROUP, INC.,** | § | |
| **D/B/A THE SALT GROUP, DEBTOR** | § | |
| | § | |
| **IN RE:** | § | **SECOND CASE NO. 18-50789-RBK** |
| **U.S TAX RECOVERY PARTNERS, LLC,** | § | |
| **DEBTOR** | § | |
| | § | **THIRD CASE NO. 18-50791-RBK** |
| **IN RE:** | § | |
| **B2B PROSPECTING, LLC** | § | **CHAPTER 11** |
| **DEBTOR** | § | |
| | § | **(Jointly Administered Under** |
| **Jointly Administered Debtors** | § | **18-50788-RBK)** |
| | § | |
| **WALTON CONSULTING &** | § | |
| **SERVICES, LLC, D.M. BALDWIN** | § | |
| **CONSULTING, LLC, CANTY AND** | § | |
| **WALTON CONSULTING, LLC,** | § | |
| **NEIL ROGERS CONSULTING &** | § | |
| **SERVICES, LLC, RLMC, LLC, AND** | § | |
| **SOWEGA TAX RECOVERY, LLC** | § | |
|     **PLAINTIFFS,** | § | |
| | § | |
| **v.** | § | **ADV. PROCEEDING NO. _____** |
| | § | |
| **US TAX RECOVERY PARTNERS, LLC,** | § | |
| **HARLAN J. HALL AND** | § | |
| **TEXAS CAPITAL BANK, NATIONAL** | § | |
| **ASSOCIATION,** | § | |
| | § | |
|     **DEFENDANTS.** | § | |

## WALTON CONSULTING & SERVICES, LLC, D.M. BALDWIN CONSULTING, LLC, CANTY AND WALTON CONSULTING, LLC, NEIL ROGERS CONSULTING & SERVICES, LLC, RLMC, LLC, AND SOWEGA TAX RECOVERY, LLC'S <u>COMPLAINT</u>

COME NOW Walton Consulting & Services, LLC ("Walton"); D.M. Baldwin

Consulting, LLC ("Baldwin"); Canty and Walton Consulting, LLC ("CWC"); Neil Rogers

Consulting & Services, LLC ("Rogers"); RLMC, LLC ("Milie"); and SOWEGA Tax Recovery,

LLC ("Weed") (hereinafter collectively "Plaintiffs" or "Franchisees") and file this Complaint, and in support thereof would respectfully show the Court as follows:

## I.
## PARTIES

1.      Plaintiffs are franchisees U.S. Tax Recovery Partners, LLC ("USTRP") and are entitled to bring this action.

2.      Plaintiffs Baldwin and Walton are creditors in the above-styled and numbered bankruptcy proceeding and are entitled to bring this action by virtue of their status as claimants.

3.      Plaintiffs Rogers, CWC, Milie, and Weed are all franchisees of debtor, are listed as creditors in Schedule G of the bankruptcy petition, and are entitled to bring this action by virtue of their status as creditors.

4.      Defendant USTRP filed a bankruptcy petition under Chapter 11 on April 2, 2018.

5.      Defendant Harlan J. Hall is an individual and is the President and CEO of Debtors. Hall is a resident of the state of Texas with his principal residence within the Western District of Texas.

6.      Defendant Texas Capital Bank, National Association ("TCB") is a Creditor against the estate of the Debtors and has previously intervened in the proofs of claim of all Plaintiffs.

## II.
## JURISDICTION AND VENUE

7.      Defendant USTRP filed a Chapter 11 bankruptcy petition on April 2, 2018.

8.      This Adversary Proceeding arises under Title 11 or arises in a case under Chapter 11 of Title 11 of the United States Code within the meaning of 28 U.S.C. § 1334.

9.      Jurisdiction is vested in this proceeding pursuant to 28 U.S.C. § 157.

10.     Jurisdiction is vested in this proceeding pursuant to 28 U.S.C. § 1367.

11.     Venue is proper pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 1334.

12.     This Adversary Proceeding involves matters that are "core proceedings" as statutorily defined in 11 U.S.C. § 157(b)(2) and which arise directly under the provisions of the Bankruptcy Code (Title 11) in the instant bankruptcy case.

### III.
### BACKGROUND

13.     The HJH Consulting Group d/b/a the SALT Group ("SALT") is a state and local tax consulting firm.

14.     SALT first franchised its business in approximately 2011.

15.     USTRP was formed to function as a franchisor.

16.     Thereafter, franchises were exclusively sold to SALT's employees and/or independent contractors.

17.     The Franchisees signed Franchise Agreements which shall hereinafter be collectively referred to as the "Franchise Agreements."

18.     Each of the Franchise Agreements covered a distinct regional area known as a "Protected Fiscal Territory."

19.     After signing the Franchise Agreements, the Franchisees were never employees of USTRP.

20.     After signing the Franchise Agreements, the Franchisees acted as an independent contractor of USTRP only when they provided services outside of their Protected Fiscal Territories.

A.    <u>Walton Consulting & Services, LLC</u>

21.    On November 11, 2011, Walton executed a Franchise Agreement with USTRP ("Walton Franchise Agreement 1").

22.    An amendment to Walton Franchise Agreement 1 was executed on March 22, 2013.

23.    A true and correct copy of the subsequent Addendum to Walton Franchise Agreement 1, between Walton and USTRP, dated October 1, 2015, is attached hereto as Exhibit A-1.

24.    On March 22, 2013, Walton executed a Franchise Agreement with USTRP ("Walton Franchise Agreement 2").

25.    Walton Franchise Agreement 2 supersedes Walton Franchise Agreement 1.

26.    A true and correct copy of the Addendum to Walton Franchise Agreement 2, between Walton and USTRP, dated October 1, 2015, is attached hereto as Exhibit A-2.

27.    On November 1, 2013, Walton executed a Franchise Agreement with USTRP ("Walton Franchise Agreement 3").

28.    Walton Franchise Agreement 3 supersedes Walton Franchise Agreement 2.

29.    A true and correct copy of the Addendum to Franchise Agreement 3, between Walton and USTRP, dated October 1, 2015 is attached hereto as Exhibit A-3.

30.    On March 21, 2014, Walton executed a Franchise Agreement with USTRP ("Walton Franchise Agreement 4").

31.    Walton Franchise Agreement 4 supersedes Walton Franchise Agreement 3.

32.    A true and correct copy of Walton Franchise Agreement 4, dated March 21, 2014 is attached hereto as Exhibit A.

33.     Walton Franchise Agreement 4 is the currently-operative agreement, between USTRP and Walton.

34.     The duration of Walton Franchise Agreement 4 is ten years.

35.     Walton has the right to renew its franchise for an additional ten years upon payment of a Renewal Fee equal to $10,000.

36.     Walton's Protected Fiscal Territory currently includes Metropolitan and Micropolitan Statistical Areas in the states of: Missouri, Illinois, Indiana, and Kentucky.

37.     A true and correct copy of the Addendum to Franchise Agreement 4, between Walton and USTRP, dated October 1, 2015, is attached hereto as Exhibit A-4.

38.     Walton had a line of credit with USTRP which could be used to pay the costs of operations within its Protected Fiscal Territories.

39.     Walton's line of credit was evidenced by a Promissory Note, a true and correct copy of which is attached hereto as Exhibit A-5.

40.     Walton's Promissory Notes was executed with a security agreement, a true and correct copy of which is attached hereto as Exhibit A-6.

41.     Walton has never committed any act which constitutes a Non-curable Default, as defined by Section 16.2 of the Franchise Agreement.

42.     Walton has never committed any act which constitutes a Curable Default, as defined by Section 16.2 of the Franchise Agreement.

43.     Walton has never committed any act which constitutes a Cross-Default, under Section 16.5 of the Franchise Agreement.

44.     USTRP has never provided Walton with notice of a Curable Default, as provided in Section 16.2 of the Franchise Agreement.

45.    USTRP has never Discontinued Services to Walton, as provided in Section 16.4 of the Franchise Agreement.

46.    Walton never voluntarily elected to terminate its franchise, as provided in Article 19 of the Franchise Agreement.

47.    USTRP has never terminated the franchise owned by Walton.

48.    USTRP has never elected to provide services to the Franchisee's customers and retain profits and amounts received from those services, as provided by Section 16.4 of the Franchise Agreement.

B.    <u>D.M. Baldwin Consulting, LLC</u>

49.    On June 23, 2014, D.M. Baldwin Consulting, LLC ("Baldwin") executed a Franchise Agreement with USTRP ("Baldwin Franchise Agreement 1").

50.    The duration of the Franchise is for a period of ten years.

51.    Baldwin has the right to renew its franchise for an additional ten years upon payment of a Renewal Fee equal to $10,000.

52.    Baldwin's Protected Fiscal Territory currently includes Metropolitan and Micropolitan Statistical Areas in the state of: Michigan.

53.    A true and correct copy of the Franchise Agreement between Baldwin and USTRP, dated June, 13, 2014, is attached hereto as Exhibit B.

54.    A true and correct copy of the Addendum between Baldwin and USTRP, dated April 01, 2016, is attached hereto as Exhibit B-1.

55.    Baldwin had a line of credit with USTRP which could be used to pay the costs of operations within their Protected Fiscal Territories.

56.    Baldwin's line of credit was evidenced by a Promissory Note, a true and correct copy of which is attached hereto as Exhibit B-2.

57.     Baldwin's Promissory Notes was executed with a security agreement, a true and correct copy of which is attached hereto as Exhibit B-3.

58.     Baldwin has never committed any act which constitutes a Non-curable Default, as defined by Section 16.2 of the Franchise Agreement.

59.     Baldwin has never committed any act which constitutes a Curable Default as defined by Section 16.2 of the Franchise Agreement.

60.     Baldwin has never committed any act which constitutes a Cross-Default, under Section 16.5 of the Franchise Agreement.

61.     USTRP has never provided Baldwin with notice of a Curable Default, as provided in Section 16.2 of the Franchise Agreement.

62.     USTRP has never Discontinued Services to Baldwin, as provided in Section 16.4 of the Franchise Agreement.

63.     Baldwin never voluntarily elected to terminate its franchise, as provided in Article 19 of the Franchise Agreement.

64.     USTRP has never terminated the franchise owned by Baldwin.

65.     USTRP has never elected to provide services to the Franchisee's customers and retain profits and amounts received from those services, as provided by Section 16.4 of the Franchise Agreement.

C.      <u>Canty and Walton Consulting, LLC</u>

66.     In 2014, CWC executed a Franchise Agreement with USTRP ("CWC Franchise Agreement 1").

67.     A copy of CWC Franchise Agreement 1, or subsequent amendments or addendums are not currently in the custody or control of Douglas Walton due to the fact that

USTRP maintained records of the agreement and all subsequent addendums, and have since discontinued Douglas Walton's access to this information.

68.     The duration of the Franchise is for a period of ten years.

69.     CWC has the right to renew its franchise for an additional ten years upon payment of a Renewal Fee equal to $10,000.

70.     CWC's Protected Fiscal Territory currently includes Metropolitan and Micropolitan Statistical Areas in the states of: Kansas, Nebraska, Minnesota, and Iowa.

71.     CWC had a line of credit with USTRP which could be used to pay the costs of operations within their Protected Fiscal Territories.

72.     CWC's line of credit was evidenced by a Promissory Note, a copy of which is in the care, custody, and control of USTRP.

73.     CWC's Promissory Notes was executed with a security agreement, a copy of which is in the care, custody, and control of USTRP.

74.     CWC has never committed any act which constitutes a Non-curable Default, as defined by Section 16.2 of the Franchise Agreement.

75.     CWC has never committed any act which constitutes a Curable Default, as defined by Section 16.2 of the Franchise Agreement.

76.     CWC has never committed any act which constitutes a Cross-Default, under Section 16.5 of the Franchise Agreement.

77.     USTRP has never provided CWC with notice of a Curable Default, as provided in Section 16.2 of the Franchise Agreement.

78.     USTRP has never Discontinued Services to CWC, as provided in Section 16.4 of the Franchise Agreement.

79.     CWC never voluntarily elected to terminate its franchise, as provided in Article 19 of the Franchise Agreement.

80.     USTRP has never terminated the franchise owned by CWC.

81.     USTRP has never elected to provide services to the Franchisee's customers and retain profits and amounts received from those services, as provided by Section 16.4 of the Franchise Agreement.

D.      Neil Rogers Consulting, LLC

82.     On March 22, 2013, Rogers executed a Franchise Agreement with USTRP ("Rogers Franchise Agreement 1").

83.     An addendum to Rogers Franchise Agreement 1 was executed on March 4, 2016.

84.     A true and correct copy of the Addendum between Rogers and USTRP, to Rogers Franchise Agreement 1, dated March 4, 2016, is attached hereto as Exhibit C-1.

85.     On April 2, 2013 Rogers executed a Franchise Agreement with USTRP ("Rogers Franchise Agreement 2").

86.     Rogers Franchise Agreement 2 supersedes Rogers Franchise Agreement 1.

87.     An addendum to Rogers Franchise Agreement 2 was executed on March 4, 2016.

88.     A true and correct copy of the Addendum between Rogers and USTRP, to Franchise Agreement 2, dated March 4, 2016 is attached hereto as Exhibit C-2.

89.     On March 18, 2014, Rogers executed a Franchise Agreement with USTRP ("Rogers Franchise Agreement 3").

90.     The duration of Rogers Franchise Agreement 3 is ten years.

91.     Rogers Franchise Agreement 3 supersedes Rogers Franchise Agreement 2.

92.     A true and correct copy of Rogers Franchise Agreement 3, dated March 18, 2014 is attached hereto as Exhibit C.

93.    A true and correct copy of the Addendum between Rogers and USTRP, to Rogers Franchise Agreement 3, dated March 4, 2016, is attached hereto as Exhibit C-3.

94.    Rogers has the right to renew its franchise for an additional ten years upon payment of a Renewal Fee equal to $10,000.

95.    Rogers' Protected Fiscal Territory currently includes Metropolitan and Micropolitan Statistical Areas in the states of: North Carolina, South Carolina, Tennessee and Virginia.

96.    Rogers had a line of credit with USTRP which could be used to pay the costs of operations within their Protected Fiscal Territories.

97.    Rogers' line of credit was evidenced by a Promissory Note, a true and correct copy of which is attached hereto as Exhibit C-4.

98.    Rogers' Promissory Notes was executed with a security agreement, a true and correct copy of which is attached hereto as Exhibit C-5.

99.    Rogers has never committed any act which constitutes a Non-curable Default, as defined by Section 16.2 of the Franchise Agreement.

100.    Rogers has never committed any act which constitutes a Curable Default, as defined by Section 16.2 of the Franchise Agreement.

101.    Rogers has never committed any act which constitutes a Cross-Default, under Section 16.5 of the Franchise Agreement.

102.    USTRP has never provided Rogers with notice of a Curable Default, as provided in Section 16.2 of the Franchise Agreement.

103.    USTRP has never Discontinued Services to Franchisee, as provided in Section 16.4 of the Franchise Agreement.

104.    Rogers never voluntarily elected to terminate its franchise, as provided in Article 19 of the Franchise Agreement.

105.    USTRP has never terminated the franchise owned by Rogers.

106.    USTRP has never elected to provide services to the Franchisee's customers and retain profits and amounts received from those services, as provided by Section 16.4 of the Franchise Agreement.

E.      RLMC, LLC

107.    On August 5, 2013 Milie executed a Franchise Agreement with USTRP ("Milie Franchise Agreement 1").

108.    The duration of the Milie Franchise Agreement is ten years.

109.    Milie has the right to renew its franchise for an additional ten years upon payment of a Renewal Fee equal to $10,000.

110.    Milie's Protected Fiscal Territory currently includes Metropolitan and Micropolitan Statistical Areas in the state of: Florida.

111.    A true and correct copy of the Franchise Agreement between Milie and USTRP, dated August 2, 2013, is attached hereto as Exhibit D.

112.    A true and correct copy of the Addendum to Milie Franchise Agreement 1, between Milie and USTRP, dated March 4, 2016, is attached hereto as Exhibit D-1.

113.    Milie had a line of credit with USTRP which could be used to pay the costs of operations within their Protected Fiscal Territories.

114.    Milie's line of credit was evidenced by a Promissory Note, a true and correct copy of which is attached hereto as Exhibit D-2.

115.    Milie's Promissory Notes was executed with a security agreement, a true and correct copy of which is attached hereto as Exhibit D-3.

11

116.    Milie has never committed any act which constitutes a Non-curable Default, as defined by Section 16.2 of the Franchise Agreement.

117.    The Franchisee has never committed any act which constitutes a Curable Default, as defined by Section 16.2 of the Franchise Agreement.

118.    Milie has never committed any act which constitutes a Cross-Default, under Section 16.5 of the Franchise Agreement.

119.    USTRP has never provided Milie with notice of a Curable Default, as provided in Section 16.2 of the Franchise Agreement.

120.    USTRP has never Discontinued Services to Milie, as provided in Section 16.4 of the Franchise Agreement.

121.    Milie never voluntarily elected to terminate its franchise, as provided in Article 19 of the Franchise Agreement.

122.    USTRP has never terminated the franchise owned by Milie.

123.    USTRP has never elected to provide services to the Franchisee's customers and retain profits and amounts received from those services, as provided by Section 16.4 of the Franchise Agreement.

F.      SOWEGA Consulting, LLC

124.    On October 4, 2011, Weed executed a Franchise Agreement with USTRP ("Weed Franchise Agreement 1").

125.    An addendum to Weed Franchise Agreement 1 was executed thereafter; a copy of which is in the care, custody, and control of USTRP.

126.    On August 2, 2013, Weed executed a Franchise Agreement with USTRP ("Weed Franchise Agreement 2").

127.    Weed Franchise Agreement 2 supersedes Weed Franchise Agreement 1.

128.    An addendum to Weed Franchise Agreement 2 was executed thereafter; a copy of which is in the care, custody, and control of USTRP.

129.    On December 16, 2013, Weed executed a Franchise Agreement with USTRP ("Weed Franchise Agreement 3").

130.    The duration of Weed Franchise Agreement 3 is ten years.

131.    Weed Franchise Agreement 3 supersedes Weed Franchise Agreement 2.

132.    A true and correct copy of Weed Franchise Agreement 3, between Weed and USTRP, dated December 16, 2013 is attached hereto as Exhibit E.

133.    Franchise Agreement 3 is the currently-operative agreement.

134.    An Addendum to Franchise Agreement 3, between Weed and USTRP, was executed, a copy of which is in the care, custody, and control of USTRP.

135.    Weed has the right to renew its franchise for an additional ten years upon payment of a Renewal Fee equal to $10,000.

136.    Weed's Protected Fiscal Territory currently includes Metropolitan and Micropolitan Statistical Areas in the states of: Alabama, Mississippi, and Georgia.

137.    Weed had a line of credit with USTRP which could be used to pay the costs of operations within their Protected Fiscal Territories.

138.    Weed's line of credit was evidenced by a Promissory Note, a true and correct copy of which is attached hereto as Exhibit E-1.

139.    Weed's Promissory Notes were executed with a security agreement, a true and correct copy of which is attached hereto as Exhibit E-2.

140.    Weed has never committed any act which constitutes a Non-curable Default, as defined by Section 16.2 of the Franchise Agreement.

141.    Weed has never committed any act which constitutes a Curable Default, as defined by Section 16.2 of the Franchise Agreement.

142.    Weed has never committed any act which constitutes a Cross-Default, under Section 16.5 of the Franchise Agreement.

143.    USTRP has never provided Weed with notice of a Curable Default, as provided in Section 16.2 of the Franchise Agreement.

144.    USTRP has never Discontinued Services to Weed, as provided in Section 16.4 of the Franchise Agreement.

145.    Weed never voluntarily elected to terminate its franchise, as provided in Article 19 of the Franchise Agreement.

146.    USTRP has never terminated the franchise owned by Weed.

147.    USTRP has never elected to provide services to the Franchisee's customers and retain profits and amounts received from those services, as provided by Section 16.4 of the Franchise Agreement.

G.    USTRP promulgated Service Contracts that were used by the Franchisees.

148.    The Franchisees were required to use USTRP's trademarks, tradenames, and other commercial symbols as the sole identification of their franchised businesses.

149.    USTRP provided the Franchisees and/or sales staff working within the Franchisees' Protected Fiscal Territory with service contracts that were used to sell services to prospective customers ("Service Contracts").

150.    USTRP required that the Franchisees use the Service Contracts it provided.

151.    The accounts generated when a Service Contract was executed in one of the Franchisees' Protected Fiscal Territories shall hereinafter be referred to as the "Accounts."

152.    The Franchisees owned the Accounts upon execution of the Service Contracts.

153.     The Franchisees continued to own the Accounts at all times after the Service Contracts were executed.

154.     USTRP acted as an intermediary between Franchisees and the clients who executed the Service Contracts.

155.     The Franchisees were not authorized to make any contract, agreement, warranty or other representation on behalf of the Franchisor, or to create any obligation, express or implied, on the Franchisor's behalf.

H.     USTRP executed Service Contracts as a nominee for the Franchisees.

156.     USTRP provided all services required to administer, manage, and process the Franchisees' jobs through completion, which included executing the Service Contract ("Contract Processing Services").

157.     USTRP provided Contract Processing Services to the Franchisees.

158.     USTRP charged the Franchisees a fee for providing Contract Processing Services.

159.     USTRP executed Service Contracts on behalf of the Franchisees.

160.     USTRP did not become the owner of the Accounts when it executed the Service Contracts.

161.     USTRP signed the Service Contracts sold within the Franchisees' Protected Fiscal Territory as a nominee for the Franchisees.

I.     The Franchisees own the Accounts.

162.     The Franchise Agreements state that the Franchisees own the Accounts that are sold within their respective Protective Fiscal Territories.

163.     The Franchise Agreements do not state or otherwise indicate that USTRP owns the Accounts.

15

164.    None of the Addenda signed by the Franchisees state or otherwise indicate that USTRP owns the Accounts.

165.    The Accounts would be transferred to USTRP only upon termination of a franchise.

J.    <u>USTRP told the Franchisees that they would own the Accounts to induce them to sign the Franchise Agreements.</u>

166.    Prior to entering into the Franchise Agreements, Harlan Hall and/or Stephen Canty stated to the Franchisees that the Franchisees would own the Accounts if they entered into the Franchise Agreements.

167.    Before entering into the Franchise Agreements, USTRP provided each of the Franchisees with a Disclosure Statement and a draft of their respective Franchise Agreements, which affirmatively state that the Franchisees would own the Accounts once they entered into the Franchise Agreements.

168.    After signing the Franchise Agreements, Harlan J. Hall reaffirmed that the Franchisees were the owners of the Accounts on many occasions, including during meetings and conferences with the Franchisees.

K.    <u>Upon signing the Franchise Agreements, the costs of processing and managing the Accounts shifted to the Franchisees.</u>

169.    The Franchisees assumed the cost of processing Accounts upon execution of their Franchise Agreements.

170.    USTRP charged the following fees for providing services to the Franchisees:

    a.    10%    of Gross Revenue for Royalty Fees;
    b.    3%     of Gross Revenue for Billing & Collection Services;
    c.    6%     of Gross Revenue for Reporting & Recovery Services; and
    d.    <u>17%    of Gross Revenue for Management Fees.</u>
           36%

171.    The aforementioned fees will hereinafter be referred to as the "Initial Fees."

172. USTRP automatically deducted the Initial Fees from all revenues it collected on the Accounts.

L.   Upon executing the Franchise Agreements, the costs of selling or auditing the Accounts shifted to the Franchisees.

173. The Franchisees assumed the cost of either selling or auditing the Accounts upon execution of their Franchise Agreements.

174. If applicable, USTRP received the following fees for providing sales services to the Franchisees:

> a.   Consultant Compensation;
> b.   BDR (Sales) Compensation fees;
> c.   Marketing Funds fees; and
> d.   Software & Maintenance Fees.

175. If applicable, USTRP also received reimbursement for the following costs:

> a.   Airfare;
> b.   Accommodations;
> c.   Meals; and
> d.   Rental vehicle/mileage.

176. The aforementioned fees and costs will hereinafter be referred to as the "Additional Fees and Costs."

177. USTRP periodically charged the Additional Fees and Costs to the Franchisees or their lines of credit.

M.   The Accounts have not been assigned to USTRP.

178. Pursuant to the terms of the Security Agreements, the Franchisees conditionally assigned the Accounts to USTRP.

179. The Franchisees' assignment of the Accounts was not an absolute assignment of the Accounts.

180.    The Franchisees assignment of the Accounts was conditional and limited to the amount of the Franchisees' debt on the Promissory Notes.

181.    To effectuate an assignment of the Accounts, USTRP must first request that the Franchisees transfer ownership of the Accounts.

182.    USTRP has never requested that the Franchisees transfer their accounts to USTRP.

N.    The Franchisees did not transfer ownership of their Accounts when they purchased additional leads.

183.    After executing the Franchise Agreements, the Franchisees purchased additional sales leads from SALT.

184.    The purchase of additional leads from SALT did not cause USTRP to become the owner of the Accounts.

O.    The Franchisees did not transfer ownership of their Accounts when the Service Contracts were modified.

185.    In approximately 2015, USTRP modified the Service Contracts so that USTRP was identified as a party to the Service Contracts.

186.    Changing the Service Contracts to identify USTRP as a party did not cause USTRP to become the owner of the Accounts.

P.    USTRP caused the Franchisees' businesses to become defunct.

187.    USTRP's former President, Stephen A. Canty, willfully manipulated the financial records of USTRP to the detriment of USTRP.

188.    Stephen A. Canty's willful misconduct began on or before January 1, 2018.

189.    TCB knew of Stephen A. Canty's willful misconduct on or before January 1, 2018.

18

190.    Stephen A. Canty's conduct caused USTRP to lose its source of financing with TCB.

191.    Stephen A. Canty's conduct caused USTRP to have to lay off many of its employees.

192.    Thereafter, Harlan Hall informed the Franchisees that it was "no longer in the tax business."

193.    Harlan Hall then gave the Franchisees permission to operate their own tax recovery businesses.

Q.    USTRP has compromised the Accounts.

194.    USTRP's ability to collect on the Accounts has been impaired by media coverage showing that it was raided by the FBI and that it has filed for bankruptcy.

195.    USTRP has publicly acknowledged that Stephen A. Canty committed fraudulent acts.

196.    USTRP has offered discounts on the Accounts without first seeking the Franchisees authorization or approval (the "Discounts").

197.    The Franchisees have the sole and exclusive right to determine the prices charged on the Accounts.

R.    USTRP has failed to apply credits to the Franchisees' lines of credit.

198.    USTRP was paid fees to manage the Accounts and allocate fees and costs to the Franchisees or their lines of credit.

199.    As manager of the Accounts, Plaintiffs placed USTRP in a position of trust and confidence and Defendants, in equity and good conscience, were bound to act in good faith with regard to the management of the Accounts and the Franchisees' lines of credit.

200.    USTRP has failed to properly apply credits to the Franchisees' lines of credit as required by the terms of the Franchise Agreements.

201.    USTRP has knowingly failed to properly apply credits to the Franchisees' lines of credit as required by the terms of the Franchise Agreements.

202.    To the extent the Franchisees' lines of credit have been fully repaid in accordance with the terms of the Franchise Agreements, USTRP has failed to disburse funds that are due and owing to the Franchisees.

203.    USTRP has concealed information from the Franchisees in an effort obscure its failure to properly apply credits to the Franchisees' lines of credit and/or disburse funds to the Franchisees.

S.      TCB has benefited from the Discounts and USTRP's improper retention of fund.

204.    USTRP has failed to disburse funds to the Franchisees and/or has filed to properly apply credits to the Franchisees' lines of credit ("Improperly Retained Funds").

205.    USTRP had no right to retain the Improperly Retained Funds.

206.    TCB knew the Improperly Retained Funds did not rightfully belong to USTRP.

207.    TCB has willfully and knowingly assisted USTRP in procuring the Improperly Retained Funds.

208.    The conduct resulted in injury to the Plaintiffs and conferred an unfair advantage on TCB.

209.    The misapplication of the Improperly Retained Funds has allowed TCB and USTRP to become unjustly enriched, by inflating the debt associated with the Franchisees' Promissory Notes.

## VI.
## <u>COUNT 1 - REQUEST FOR DECLARATORY RELIEF</u>

210.    Plaintiffs reallege and incorporate by reference all of the allegations stated above.

211.    An actual controversy exists in this case relating to (1) ownership of the Accounts and (2) the proper allocation of revenues collected on the Accounts between USTRP and the Franchisees.

212.    The issue of ownership is imperative to the validity of the fair and equitable determination of the Debtors and Creditors' right in this matter.  An adjudication of the true ownership of the Accounts is essential to determining whether the Accounts are part of the bankruptcy estate.  If the Accounts are not owned by USTRP, then the Accounts cannot be considered to be part of the bankruptcy estate, cannot considered to be the collateral of TCB, and the proceeds of the Accounts are merely held in trust by USTRP for the benefit of the Franchisees.

213.    Notwithstanding the true ownership of the Accounts, a determination as to the proper allocation of revenues collected on the Accounts is essential to determining the validity, priority, and extent of TCB's lien or other interest in the Accounts.  *See* Rule 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure.  TCB's lien in the Accounts is limited to the amount of the Franchisees' debts to USTRP.  The amounts of the Franchisees' debts to USTRP must be determined with reference to the terms of the Franchise Agreements, Promissory Notes, and Security Agreements.  If revenues collected on the Accounts are not properly allocated, then the Franchisees will be held liable in this case for debts which the Franchisees do not actually owe on their lines of credit.  The Franchisees' loss will be TCB's gains, as revenues collected on the Accounts, which contractually should have been allocated to the Franchisees and/or their lines of credit, will instead be misallocated to TCB vis-à-vis USTRP.  This misallocation of revenues

will result in a improper benefit to USTRP, as USTRP will have essentially absconded with the Franchisees' fair share of collected revenues.

214.    Moreover, it is unlikely that USTRP would be able to fulfil the terms of the current proposed plan of reorganization if revenues collected from the Accounts were properly allocated to the Franchisees, as USTRP will not be able to generate the funds required to make payment to TCB pursuant to the terms of the plan. In other words, USTRP is proposing to repay its debt to TCB by using funds that rightfully belong to the Franchisees.

215.    Upon the filing of this bankruptcy matter, USTRP knowingly and intentionally ceased to provide the Franchisees with loan and Account status reports. There can be no innocuous explanation for this conduct, and it was clearly perpetrated in an effort to obscure the truth from the Franchisees. When the Franchisees recently become aware of these issues, USTRP and TCB simply accelerated their efforts to propose and confirm their currently proposed plan of reorganization. Those efforts should be postponed until the Franchisees have had a fair opportunity to adjudication the issue of ownership of the Accounts as well as the proper allocation of revenues among the parties.

216.    This Court may hear and determined these issues pursuant to 28 U.S.C. § 157 (K), (L) and (O).

217.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9), Plaintiffs seek the following judicial declarations:

A.    <u>Declarations relating to ownership of the Accounts:</u>

218.    The Franchisees are the current owners of the Accounts.

219.    The Franchisees have owned the Accounts at all times since they first signed their Franchise Agreements.

B.      Declarations relating to USTRP's security interests:

220.    USTRP's security interest in the Accounts is limited to the amount of the Franchisees' indebtedness to USTRP.

221.    In an amount to be proved at trial, USTRP must adjust the balances of the Franchisees' debt on the Promissory Notes to comport with the terms of the Franchise Agreements.

222.    Unless authorized by the Franchisees or this Court, any and all Discounts offered by USTRP relating to the Accounts must be applied against USTRP's Initial Fees.

## V.
## COUNT 2 - REQUEST FOR EQUITABLE SUBORDINATION OF TCB'S CLAIMS

223.    Plaintiffs reallege and incorporate by reference all of the allegations stated above.

224.    As set out above, TCB substantially and significantly controlled the operations of the Debtors and willfully and knowingly engaged in inequitable and self-serving conduct with respect to Debtors and the Debtors' assets.

225.    In particular, TCB knew that USTRP had wrongfully taken control and possession of the Improperly Retained Funds and assisted and/or acquiesced to such conduct.

226.    This inequitable and self-interested conduct resulted in injury to the creditors of the Debtors, specifically the Franchisees, and conferred an unfair and inequitable advantage on TCB.

227.    Based on these facts and circumstances, and pursuant to Rule 7001(9) of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 510(c)(1), any and all claims of the Bank against each of the Debtors should be subordinated to the claims of all Franchisee creditors, or pursuant to 11 U.S.C. § 510(c)(2), any and all liens assigned to TCB against any

assets of the Franchisees should be disallowed. Such equitable subordination is not inconsistent with the provisions of the Bankruptcy Code in the context of this case.

228.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9), Plaintiffs seek a judicial declaration that, to the extent USTRP has collected on the Accounts and wrongfully procured funds that are owed to Franchisees, TCB's claims are subordinate to the those of the Franchisees.

**VI.**
**COUNT 3 - FRAUDULENT MISEPRESENTATION AND INDUCEMENT**
**(In the Alternative, Against USTRP and Harlan Hall)**

229.    Plaintiffs reallege and incorporate by reference all of the allegations stated above.

230.    If the Court should determine that the Franchisees are not the owners of the Accounts pursuant to Count 1 of this Complaint, then the Franchisees assert the following claims for Fraudulent Misrepresentation and Fraudulent Inducement in the alternative.

231.    In accordance with Rule 9 of the Federal Rules of Civil Procedure, the Franchisees plead with particularity that:

a.      Prior to entering into the Franchise Agreements, Harlan Hall and/or Stephen Canty stated to the Franchisees that the Franchisees would own the Accounts if they entered into the Franchise Agreements.

b.      Before entering into the Franchise Agreements, USTRP provided the Franchisees with a Disclosure Statement and a draft of the Franchise Agreements which  affirmatively states that the Franchisees would own the Accounts once they entered into the Franchise Agreements.

c.      After signing the Franchise Agreements, Harlan J. Hall reaffirmed that the Franchisees were the owners of the Accounts on many occasions during meetings and conferences with the Franchisees.

232.    These representations of ownership were material.

233.    These representations of ownership were false.

234.    When USTRP and Harlan J. Hall made these representations of ownership, they knew they were false, or made the representations recklessly, as a positive assertion, and without knowledge of the truth.

235.    USTRP and Hall made these representations of ownership with the intent that Plaintiffs rely upon them.

236.    Plaintiffs relied upon these representations of ownership and were induced to enter into Franchise Agreements, Promissory Notes, and Security Agreements.

237.    USTRP and Hall's representations of ownership caused harm to Plaintiffs by causing them to assume the costs associated with selling, auditing, and otherwise processing the Accounts.

238.    Plaintiffs are entitled to have the Franchise Agreements reformed to exclude USTRP's fees so that the Franchise Agreement conforms to the original intent of the parties.

239.     The Franchisees have clean hands.

240.    There has been a mutual or unilateral mistake.

241.    If the contract cannot be reformed, Plaintiffs are entitled to have the Franchise Agreements rescinded because they have no adequate remedy at law.

242.    At a minimum, all fees, costs, and other debts enumerated by USTRP in its Note Payable Activity reports to the Franchisees should be extinguished and reversed.

243.    In addition, Plaintiffs are entitled to an award of actual and consequential damages, including but not limited to damages for loss of their capital investment, interest thereon, for the value of their time and effort, and for the value of accounts payable.

244.    Plaintiffs are entitled to an award of exemplary damages for the wrongful conduct of Defendants.

245.    Defendants fraudulent misrepresentations were committed to secure execution of documents by deception and constitute a violation of Section 32.46(a)(1) of the Texas Penal Code.  As a result, the treble damages cap that would otherwise apply should be disregarded.

## VII.
## ATTORNEY'S FEES

246.    Plaintiffs are entitled to attorney's fees and costs pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

## VIII.
## PRAYER

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer, and that upon final trial, this Court enter judgment in Plaintiffs' favor as follows:

a.    that the Court issue judicial declarations as requested in this Complaint;

b.    that TCB's claims in this bankruptcy proceeding be equitably subordinated to the those of the Plaintiffs;

c.    that the Franchise Agreements be rescinded or reformed;

d.    that all debts owed on the Plaintiffs' lines of credit be adjusted to comport with the term of the Franchise Agreement and/or extinguished;

e.    that the Plaintiffs be awarded their actual, consequential, and exemplary damages;

f.     that Plaintiffs be awarded their reasonable attorney's fees and expenses in connection with the filing of this action; and

g.      for such and further relief, both general and special, at law and in equity, to which

Plaintiffs may show themselves justly entitled.

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY

By: _/s/ John Muller_____
    C. John Muller IV
    State Bar No. 24070306
    112 E. Pecan St., Suite 1450
    San Antonio, TX 78205
    Telephone: (210) 257-5807
    Facsimile:  (210) 253-8384
    john.muller@chamberlainlaw.com

SHERER & ASSOCIATES, PLLC

    Eric D. Sherer
    State Bar No. 1837890
    18756 Stone Oak Parkway, Suite 200
    San Antonio, TX  78258
    Telephone:  (210) 696-6645
    Facsimile:  (866) 305-5823
    esherer@sherer.legal

SMEBERG LAW FIRM, PLLC

    Ronald J. Smeberg
    State Bar No. 24033967
    2010 W. Kings Hwy.
    San Antonio, Texas 78201
    Telephone: (210) 695-6684
    Facsimile: (210) 598-7357
    ron@smeberg.com

**ATTORNEYS FOR PLAINTIFFS**